UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| KENNETH D. BAKER, | ) | |
|---|---|---|
| | ) | |
| Petitioner, | ) | |
| | ) | No. 3:16-cv-1445 |
| v. | ) | Judge Sharp |
| | ) | |
| BRIANNE M. BAKER, | ) | |
| | ) | |
| Respondent. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter arose upon the Petition for Return of Children pursuant to the Hague Convention on the Civil Aspect of International Child Abduction (the "Hague Convention"), and the implementing legislation in the United States, the International Child Abduction Remedies Act ("ICARA"), set forth in 42 U.S.C. § 11601, *et seq.*

Petitioner Kenneth Baker requests this Court to enter an Order directing that the parties' minor children, LMB and MAB, be returned to Germany. He alleges that the children's mother, Respondent Brianne Baker, unlawfully removed the children on or about May 3, 2016, and has wrongfully retained them in the United States. (Docket Entry No. 1, Verified Petition). Petitioner also claims that he has rights of custody of the children under the law of Germany in that he is their natural father and is married to Respondent; and that he was actually exercising these rights within the meaning of the Hague Convention at the time of their wrongful retention. (*Id.*).

Respondent contends that the children's habitual residence is the United States, Petitioner was not exercising his rights of custody at the time of their removal, and Petitioner consented to their removal to the State of Tennessee. (Docket Entry No. 8). Petitioner responds that he did

1

not consent to the removal of the children from Germany to reside in Tennessee, that he did not acquiesce to their retention in Tennessee, but immediately took steps to obtain their return pursuant to the Hague convention. (Docket Entry No. 1).

The Court held a bench trial in this matter on September 14-15, 2016 and October 13, 2016, after which the parties were instructed to file post-trial briefs. Those briefs were filed on November 21, 2016.

Having reviewed the parties' post-trial briefs, the record, the exhibits received in evidence, and the testimony of the witnesses, after considering their interests and demeanor, the Court enters the following Findings of Fact and Conclusions of Law. Except where the Court discusses different testimony on a specific issue, any contrary testimony on a specific matter has been rejected in favor of the specific fact found. Further, the Court omits from its recitation facts, which it deems to be immaterial to the issues presented.

## I. <u>FINDINGS OF FACT</u>[1]

Petitioner and Respondent were married on April 12, 2004, in Clarksville, Tennessee. The parties have two minor children, LMB and MAB, who are the subject of the Petition. LMB was born on December 8, 2005, and MAB was born on January 6, 2008.[2]

Petitioner is a Chief Warrant Officer 3 in the United States Army. His job often required that he and his family relocate to new duty stations around the United States and in Germany. The parties first lived in Clarksville, Tennessee and move to Honolulu, Hawaii after their marriage in 2004. Prior to the birth of LMB, Respondent moved back to Clarksville, Tennessee to live with her parents while Petitioner was deployed. When LMB was approximately 10 months old, Respondent moved back to Hawaii to be with Petitioner. After MAB was born in

---

[1] The redacted trial transcripts may be found at Docket Entry Nos. 31-34, 43-46.

[2] The parties and their children are all United States citizens.

2008, Respondent and the children moved back to Tennessee while Petitioner trained in Arizona. After training, the parties moved to Fort Polk, Louisiana and stayed approximately three years.

In 2012, the Army issued Orders, with an April 1, 2012 reporting date, taking Petitioner and his family to Wiesbaden, Germany. Petitioner, Respondent, and the children resided in Wiesbaden for three years in a house located off base. While residing in Wiesbaden, the children attended school, celebrated birthdays, attended German festivals, and were active in extra-curricular activities. Specifically, LMB was involved in cheerleading, participated in dodgeball, and played soccer on a team coached by Petitioner. MAB was involved in dance and baseball.

On April 22, 2015, the Army issued Orders, with a July 13, 2015 reporting date,[3] to Stuttgart, Germany. Thereafter, the parties and their children made a trip to the United States for four weeks during the summer of 2015 visiting family. During the trip, Respondent told Petitioner she did not want to return to Germany because "she felt [she] was already done with her marriage at that point." (Docket Entry No. 33 at 107). She felt "[she] had been hurt too many times . . ." (*Id.*). Petitioner thereafter promised Respondent that she and the children would be able to return to Tennessee if things did not work out in their marriage.[4] Relying on this promise, Respondent ultimately agreed to return. It was actually a "last-minute decision right before [they] were supposed to go to the airport to . . . give it one last shot." (*Id.* at 106-107).

Petitioner and his family ultimately moved to Stuttgart, Germany. There, the children attended school, participated in Girl Scouts, enjoyed trips to the mineral bath, and played with friends. While in Stuttgart, the parties continued having difficulties in their marriage. On

---

[3] The current assignment ends in July 2018.

[4] Between summer 2015 and February 2016, Respondent testified that the parties "probably talked about that kind of stuff daily. It was a big deal." (Docket Entry No. 33 at 134-135).

February 25, 2016, the issues in their marriage came to a head. On that evening, Petitioner had a few drinks after work. When he returned home, he consumed two beers and then asked his wife if she would take him and the children to get dinner. The argument escalated and Petitioner stated that he was going to file for divorce in Germany. At some point during the conversation, Respondent hit him with her iPad. Petitioner allegedly became fearful for his safety, so he took the children and drove to the Military Police ("MP") station, which was one-quarter mile from the family's home.

When Petitioner arrived at the MP station, the desk sergeant smelled alcohol on his breath, which led to him being charged with a DUI. After Petitioner completed his interview with the MP, a member of his command, Major Benjamin Terwilliger, picked up Petitioner and the children and took them to a hotel for the evening. At some point, on that same evening, Respondent, who admitted to hitting Petitioner, was apprehended and charged with domestic violence. After the February 25, 2016 incident, the parties separated and Petitioner moved into the barracks. The children returned to the house to stay with Respondent, but Petitioner continued to have visitation with the children by agreement of the parties.[5]

Prior to the February 26, 2016 incident (in October 2015), the parties began considering the possibility of requesting an Early Return of Dependents ("EROD"). An EROD is a mechanism by which a family member of a service member can have their family return to the United States paid for by the military. As part of the EROD process, a service member and his spouse must go through counseling and have a chaplain sign off on the paperwork. In an effort

---

[5] In 2008, approximately eight years prior to the February 25, 2016 incident, Petitoner drove with the oldest child after he had been drinking. Respondent did not report this incident to the authorities. On July 2, 2016, Petitioner was charged with his second DUI. This incident occurred after Respondent had taken the children to the United States. In order to deal with his alcohol use, Petitioner has enrolled in the Army Substance Abuse Program, is going to AA meetings, talking to a behavior health specialist, regularly seeing a chaplain, and volunteering with his Church.

to reconcile with his wife, Petitioner utilized the counseling services provided in connection with the soldier-initiated EROD paperwork in order to work on the marriage.[6]

According to Petitioner, when he did not complete this paperwork, a counselor contacted his command. Thereafter, command ordered him to complete the EROD paperwork. Petitioner, in order to comply with command's order, continued to work on getting signatures on the EROD paperwork, but dragged his feet on completing it. On February 26, 2016, after the events of the prior evening, Petitioner realized that he and Respondent would not be able to reconcile. After this realization, Petitioner, in order to comply with command's lawful order, prepared a Memorandum and Personnel Action for the early return of his wife and children.

In submitting this document, though, Petitioner allegedly did not intend to allow his children to leave Germany. Rather, Petitioner submitted this document knowing that he was going to file for custody in German Civil Court. On this document, Petitioner listed the requested return date of June 26, 2016, so that he would have time to file for custody in Germany and prevent EROD orders from being issued. Petitioner then filed a petition for temporary custody of the children in German Civil Court on March 21, 2016. On April 15, 2016, he filed a petition for permanent custody in German Civil Court. Based on advice that he received from JAG, Petitioner believed that by filing for custody in Germany, he would prevent EROD orders from being issued.

The German Civil Court set a hearing for May 4, 2016. On April 27, 2016, in anticipation of the German Court proceedings, Petitioner sent Respondent an email asking for

---

[6] That paperwork, however, was never completed and never submitted to command for approval.

her not to leave with the children. On April 28, 2016, Respondent was served with a summons to appear in Court on May 4, 2016, via email, and she was personally served on April 29, 2016.[7]

After receiving the paperwork and summons, she made an appointment to speak with JAG the next day. That evening she gathered the paperwork,[8] put it in a folder, and placed her keys on top. The following day, after sending her children off to school, she noticed her keys and certain documents were missing. (Docket Entry No. 33 at 124-125). Respondent had a friend drive her Major Terwilliger's office, and he asked if Petitioner still had a key to the apartment, to which she replied "yes." (*Id*. at 127). Major Terwilliger then contacted Petitioner to bring the key.[9]

During this meeting, Respondent and Major Terwilliger discussed the possibility of an emergency EROD. Respondent followed up this meeting with an email to Major Terwilliger dated April 30, 2016. (Emails between Respondent and Major Terwilliger, Respondent's Exhibit 17.) In this email, Respondent plead for "immediate orders for myself and my children to leave Germany." As part of the basis for her request, Respondent states that since the EROD paperwork with the June 26, 2016 leave date was submitted, her "estranged spouse has tried many tactics to override that decision." (*Id*.).

On May 3, 2016, Respondent met with Major Terwilliger to sign the Emergency EROD papers. The return date listed on the Emergency EROD was May 6, 2016. The Emergency EROD was command-directed and Petitioner had no knowledge it was being executed until after

---

[7] Respondent testified that she could not recall a single time, wherein Petitioner told her he had changed his mind about her and the children leaving Germany. In fact, she was not aware of the German custody filing until she was served, a few days prior to leaving. She had no idea about the March filing until the end of April. (Docket Entry No. 33 at 133).

[8] The original EROD with signatures was also contained in the folder. (*Id*.).

[9] It is Respondent's belief that Petitioner entered her house with his key and took the missing documents and keys.

6

the fact. Thereafter, Respondent asked Major Terwilliger to retrieve the passports. On that same day, Petitioner was ordered by command to give up the passports. In fact, the Emergency EROD orders "direct the service member to provide their passports in order to facilitate travel." (Docket Entry No. 34, Emergency EROD Orders, Petitioner's Exhibit 13). Petitioner ultimately gave up the passports.

Before a German Court could enter a custody Order, Petitioner removed the children from Germany. On May 3, 2016, Petitioner took the children and flew to the United States, despite having knowledge of the custody hearing that was scheduled for the next day in German Civil Court. Respondent's parents purchased the one-way plane tickets for Respondent and the children.

When Petitioner appeared for the German Court custody hearing on May 4, 2016, and Respondent did not appear, Petitioner grew concerned that Respondent had left with the children. Petitioner then called the school in an effort to locate his children and learned that the children had not been in school all week. After realizing that the children were no longer in Germany, he filed a police report with the German police, filed a Request for Return of the children, and called the Clarksville Police Department.

On June 17, 2016, Petitioner's Verified Petition requesting the return of the children was filed with this Court. *See* (Docket Entry No. 1).[10]

## II. CONCLUSIONS OF LAW

A.  *The Hague Convention and ICARA*

The Hague Conference on Private International Law adopted the Hague Convention on the Civil Aspects of International Child Abduction in 1980. T.I.A.S. No. 11670, S. Treaty Doc.

---

[10] A divorce action filed by Respondent is currently pending in the Circuit Court of Montgomery, Tennessee, Case No. CC16CV1247. The action was filed on June 22, 2016.

No. 99–11. In 1988, the United States ratified the treaty and passed implementing legislation, known as the International Child Abduction Remedies Act, 102 Stat. 437, 42 U.S.C. § 11601, *et seq. See generally Abbott v. Abbott,* 560 U.S. 1, 130 S.Ct. 1983, 1989–1990, 176 L.Ed.2d 78 (2010).

ICARA postulates that an individual seeking the return of a wrongfully retained child may "commence a civil action by filing a petition" in a court with jurisdiction over the action. 42 U.S.C. § 11603(b). The federal district courts and state courts have concurrent jurisdiction over such actions. 42 U.S.C. § 11603(a-b). When faced with a petition for return of a child under the Hague Convention, the courts of signatory nations may only determine the merits of the abduction claim; the merits of the underlying custody claim are not to be considered. Hague Convention, Article 19; *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir. 1993) ("*Friedrich I*"). The Convention seeks to "restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II*").

Article 3 of the Hague Convention provides that the "removal or the retention of a child is to be considered wrongful" when "it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." *Ibid.*

Article 12 then states:

"Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention,

the authority concerned shall order the return of the child forthwith." *Id.,* at 9.

*Chafin v. Chafin*, 133 S. Ct. 1017, 1021 (2012).

Once a petitioner meets this burden, return of the child will be ordered unless the respondent prevails on one of the available affirmative defenses. Specifically, a court may decline to return a child if the respondent proves by a preponderance of the evidence that the petition for return was filed more than one year from the removal or retention and the child is well-settled in his new environment; or that the petitioner was not actually exercising his/her custody rights at the time of the removal or retention; or that the petitioner had consented to or acquiesced in the removal or retention; or if the Court finds that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." 42 U.S.C. § 11603(e)(2)(B), incorporating Articles 12 and 13 of the Hague Convention.

In addition, pursuant to 42 U.S.C. § 11603(e)(2)(A), a court may decline to return a child if the respondent proves by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation;" Hague Convention, Art. 13(b); or the return "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." Hague Convention, Art. 20.

B.  *Petitioner's Prima Facie Case*

To carry his burden of establishing by a preponderance of the evidence that the children were wrongfully retained in the United States, Petitioner must establish that Germany was the children's "habitual residence" at the time Respondent retained them in the United States, and

that Petitioner would have exercised custody rights at the time of the retention had the children not been retained. *Friedrich I*, 983 F.2d at 1400.

      i.      Habitual Residence

Neither the Convention nor ICARA defines "habitual residence." The Sixth Circuit has stated that habitual residence is not to be confused with "domicile" and that courts must "focus on the child, not the parents, and examine past experience, not future intentions" in determining a child's habitual residence. *Id.* at 1401. "On its face, habitual residence pertains to customary residence prior to removal. The court must look back in time, not forward." *Id.*

In holding that the habitual residence inquiry focuses on "past experience, not future intentions," the Sixth Circuit in *Friedrich I* stated that the future intentions of the parents are "irrelevant." 983 F.2d at 1401. Thus, the *Friedrich I* court dismissed arguments that "pertain[ed] to the future" and "reflect[ed] the intentions of [the mother]." *Id.* (holding that child's habitual residence was Germany because child was born there and lived there his entire life, despite the fact that his mother, a member of the armed forces, intended to return to the United States upon her discharge).[11]

A child's habitual residence is the nation where, at the time of his/her removal, the child has been present long enough to allow acclimatization, and where this presence has a "degree of settled purpose from the child's perspective." *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007) (citing *Feder,* 63 F.3d at 224). Such a holding is not only consistent with the collective

---

[11] At the time of the *Friedrich I* ruling, the Sixth Circuit was one of the only circuit courts of appeals to have addressed the question of how to determine a child's habitual residence under the Hague Convention. Some of our sister Circuits have parted ways with our decision in *Friedrich I*. Rather than limiting their inquiry to *Friedrich I*'s five guiding principles, these Circuits have introduced an additional factor: the subjective intent of the parents. *See, e.g.*, *Feder v. Evans-Feder,* 63 F.3d 217 (3rd Cir.1995); *Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001). The merits of the petition will be addressed with these criticisms of *Friedrich I* in mind, but with full awareness that *Friedrich I* remains the law in this Circuit.

wisdom of many of "our sister Circuits," but it is also consistent with *Friedrich I*'s holding that a habitual residence inquiry must "focus on the child, not the parents, and examine past experience, not future intentions." *Id.* (citing *Friedrich I*, 983 F.2d at 1401).

Petitioner argues that the children's habitual residence is Germany, while the Respondent counters that their habitual residence is the United States. Petitioner supports his contention by arguing the children "called Germany—first Wiesbaden and then Stuttgart—their home for almost four years, nearly half of MAB's life." (Docket Entry No. 40 at 11). Further, Petitioner argues, while residing in Germany, the children "attended school, made friends, celebrated birthdays, attended German festivals, and were active in many extra-curricular activities, such as cheerleading, dodgeball, soccer, dance, girl scouts, and baseball." (*Id.*).

Respondent urges that the children's habitual residence is the United States. Respondent supports this contention by arguing,

> The parties' prior habitual residence of Germany began to be modified when the parties agreed in July, 2015 that if the marriage did not work out, Mr. Baker would send the wife and the minor children back to the United States.
>
> At that time, there was no longer a "settled purpose" that the parties would reside in Germany. Rather, in March, 2016, the children were aware they would be moving back to Tennessee.

(Docket Entry No. 41 at 5).

A child's habitual residence is not "easily altered" and can be altered only by "a change in geography and the passage of time." *Friedrich I*, 983 F.2d at 1401 (finding that child's three day stay on a U.S. military base was insufficient to establish the United States as his habitual residence). Since 2012, the children had lived in Germany continuously for more than four years, excluding a single trip in 2015 of four weeks to the United States, from which they

returned to Germany until their most recent trip. Furthermore, the evidence shows that after their return to Germany, the children continued to be involved in community activities.

Although the Court acknowledges that the children are United States citizens,[12] are enrolled in a Tennessee public school, and the testimony has provided that they seem to be doing well in their new environment, these facts are not sufficient to outweigh the "degree of settled purpose" perceived by the children immediately preceding their retention. Accordingly, the evidence about the children's lives in Germany shows that, immediately prior to their most recent move to the United States, Germany was their habitual residence.

      ii.      Custody Rights

Petitioner insists that "[t]here can be no genuine dispute that Mr. Baker, as the children's biological father, has custodial rights under German law which is the law of the country of habitual residence." (Docket Entry No. 40 at 12). Moreover, Petitioner was exercising those rights at the time the children were removed from Germany. (*Id.*). In support, Petitioner provides the following undisputed facts:

> Mr. Baker responded to and addressed Ms. Beckham's concerns regarding MAB's behavior in the classroom (DE # 31, PageID # 258); that Mr. Baker volunteered and brought in birthday treats for MAB's birthday (*Id.*); that Mr. Baker took the children to festivals (DE # 31, PageID # 286.); that Mr. Baker coached LMB's soccer team (DE # 31, PageID # 277.); that Mr. Baker regularly had lunch at school with his daughters (DE # 31, PageID # 288.); that Mr. Baker took sewing lessons with his daughter LMB (DE # 31, PageID # 278.); that Mr. Baker cooked, helped the children with homework, packed the children's lunches, and attended parent teacher conferences (DE # 33, PageID ## 580-581.); and that Mr. Baker regularly spent time with his children, especially on the weekends,

---

[12] The fact that the children are United States citizens does not alter the calculus, *see Friedrich I*, 983 F.2d at 1401 (finding that citizenship was insufficient to establish that child was a habitual resident of the United States), nor does the fact that the children have spent a portion of their lives in the United States, as it is the time period immediately preceding their retention in the United States that is at issue in determining their habitual residence, *Feder*, 63 F.3d at 224 (finding the fact that child lived in the United States for six years was not relevant where he was habitually resident in Australia during the six months immediately preceding his retention in the United States).

even after the parties separated (DE # 31, PageID # 299; DE # 33, PageID # 549; DE # 34, PageID # 688.)

(*Id*.). Respondent responds, in this instance, an administrative decision performed by the military had the "practical effect of removing [Petitioner's] ability to exercise custody since the military expedited the EROD process." (Docket Entry No. 41 at 21). Petitioner disagrees, arguing, "nothing in the EROD required [Respondent] to leave Germany" on May 3, 2016. (Docket Entry No. 47 at 4).

Under German law, both parents share equal *de jure* custody of a child, which continues unless and until a court rules otherwise. *See Friedrich II,* 78 F.3d at 1064 (citing German Civil Code 1626(1)); *Bader v. Kramer,* 484 F.3d 666, 670 (4th Cir. 2007) ("German law vests both parents with joint custody of a child until a competent court enters a contrary order."). Thus, Petitioner had custody rights under German law. Respondent does not assert any facts that demonstrate a clear and unequivocal abandonment of the children by Petitioner. Indeed, Petitioner has played a tremendous role in the children's lives over the past four years, with the exception of their most recent visit to the United States, and, by all accounts, Petitioner would have continued to exercise those rights but for the Respondent's retention of the children in the United States. Accordingly, there is no evidence here to suggest, that Petitioner was not exercising his rights of custody at the time of the children's removal.

    iii.    Wrongful Retention

To establish the children were wrongfully retained in the United States, Petitioner bears the burden of establishing not only that Germany was their habitual residence, but also that he would have exercised custody rights had the children not been retained in the United States. Under the Hague Convention, a parent's custody rights "must be determined under the law of the child's habitual residence." *Friedrich I*, 983 F.2d at 1402. Additionally, "if a person has valid

13

custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich II*, 78 F.3d at 1066.

Pursuant to Article 14 of The Hague Convention, in ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the Court may take notice directly of the following:

> . . . .the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of this law or for the recognition of foreign decisions which would otherwise be applicable.

Petitioner has demonstrated not only that the children were habitual residents in Germany at the time of their retention in the United States, but also that he would have exercised his custody rights at that time if not for their retention. Thus, Petitioner has satisfied his burden of establishing by a preponderance of the evidence that the children were wrongfully retained from Germany. Hence, this case turns solely on whether one or more affirmative defenses to the wrongful removal have been established.

C.   *Respondent's Affirmative Defenses*

Having found that Petitioner has established a *prima facie* case for the children's return to Germany, the Court must next consider Respondent's affirmative defenses to determine whether she can demonstrate a basis for relief from removal, pursuant to one of the narrow exceptions recognized by law.

A court may decline to return a child if the respondent proves by a preponderance of the evidence that the petition for return was filed more than one year from the removal or retention and the child is well-settled in his new environment; or that the petitioner was not actually exercising his/her custody rights at the time of the removal or retention; or that the petitioner had

consented to or acquiesced in the removal or retention; or if the Court finds that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." 42 U.S.C. § 11603(e)(2)(B), incorporating Articles 12 and 13 of the Hague Convention. In addition, pursuant to 42 U.S.C. § 11603(e)(2)(A), a court may decline to return a child if the respondent proves by clear and convincing evidence that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation;" Hague Convention, Art. 13(b).

      i.      Consent and Acquiescence

Article 13(a) of the Convention permits the Court to refuse to order the return of children, despite a wrongful removal or retention, if Respondent proves by a preponderance of the evidence that Petitioner "had consented to or subsequently acquiesced in the removal or retention." Acquiescence or consent to removal of the child "requires more than an isolated statement to a third-party. Each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Friedrich II,* 78 F.3d at 1070. Unlike consent, acquiescence must be formal, and might include "testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Id.*

Respondent raises the defense of consent claiming that Petitioner consented to the children's removal or retention. It is Petitioner's position that there is no evidence of consent in "the alleged statements made by [Petitioner] in July 2015, wherein he allegedly told Respondent that she and the children could return to the United States if things did not work out between them in Germany." (Docket Entry No. 40 at 17). Petitioner argues that this Court should refuse to find consent based on one conversation that occurred almost a year before the children were

removed from Germany. (*Id*.). Petitioner further points the Court to the *Simcox*[13] case, wherein the Sixth Circuit stated that "each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights." *Id.* (quoting *Friedrich II*, 78 F.3d at 1069). Moreover, Petitioner argues,

> the *Simcox* Court reasoned that "a single e-mail message indicating a willingness to allow the children to live with their mother in Ohio should not be the basis for a finding that Mr. Simcox consented to their removal, especially given the manner in which Mrs. Simcox removed the children."

(Docket Entry No. 40 at 16). According to Respondent, the parties did indeed have a conversation in July 2015 pertaining her and the children's return to the United States, wherein Petitioner promised Respondent that she and the children would be able to return to Tennessee if things did not work out in their marriage. However, it was not a single conversation – in fact, she testified between the summer of 2015 and the February 2016 accident, the parties "probably talked about that kind of stuff daily. It was a big deal." (Docket Entry No. 33, at 134-135). Moreover, although Petitioner makes the argument that the words of Respondent during the separation are not to be "scrutinized for a possible waiver of custody rights," Respondent does not contend that the conversations continued after their separation in February. The Court, having observed Respondent testify on this matter at trial, finds her testimony highly credible that Petitioner did consent to the removal of the children from Germany.

Petitioner next argues that even if the February Personnel Action could be a basis to support his consent, he only consented for the children to leave Germany on or after June 2016. (Docket Entry No. at 18). The Court agrees that the actions related to the EROD after the February incident do not support consent. And the Court is further aware the EROD paperwork was never completed. However, Petitioner's argument is conflicted by his initial decision to

---

[13] *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007).

begin the EROD paperwork in November 2015. It was not command-directed. The Court finds Petitioner's acknowledgement of him volunteering to begin this process further supports Respondent's contention of his agreement to return her and the children to the United States.

Further, Petitioner claims the "deliberately secretive nature" of Respondent's actions is "extremely strong evidence" that Petitioner did not consent to the children's removal. (*Id*.). Petitioner's actions surrounding the custody filings in the German court could also be considered as "deliberately secretive." Allegedly in an effort to prevent the children from leaving Germany and prevent EROD orders from being issued, Petitioner filed for temporary, and ultimately permanent custody. Respondent was not forewarned by Petitioner nor was she alerted until a month later. Although the initial filing took place in March 2016, Respondent was not notified until the end of April 2016. Having also had the benefit of observing Petitioner during his testimony, the Court finds the testimony on the issue of consent unconvincing and not believable. Subsequently, Petitioner's last-minute purported attempt of retraction is not enough to render the agreement by the parties (and his consent) null. The Court further finds that the actions of Petitioner in seeking to preserve his rights of custody through the German courts prior to the removal, does not undercut the fact that he consented to the removal of the children.

Viewing the testimony of Respondent as the more credible testimony, the Court finds for purposes of the Hague Convention, that Respondent has established by a preponderance of the evidence that Petitioner gave his consent for Respondent to return to the United States with the minor child. Accordingly, Respondent is entitled to relief under Article 13a.

ii. Grave Risk of Harm

As enumerated by Article 13 of the Convention, a child may not be returned to his or her

17

habitual residence due to the grave risk of either "physical or psychological harm" or the existence of an "intolerable situation." Hague Convention, supra note 2, art. 13. Either component of this affirmative defense must be proven by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). Respondent argues that the minor children would be subject to a grave risk of harm "arising from the father's instability, his anger issues, his alcoholism[14], and the personality traits which tend to make him controlling and badgering in his relationships." (Docket Entry No. 41 at 23).

The evidence at trial failed to establish that there has ever been physical abuse by Petitioner, and in fact, Respondent has never been concerned about Petitioner potentially harming the children while they are in his care. Furthermore, there was no expert testimony supporting any psychological harm by Petitioner toward the children. There is nothing in the record to indicate that Petitioner is a danger to his children. Accordingly, Respondent has failed to show by clear and convincing evidence that the children would be exposed to a grave risk of harm if returned to Germany.[15]

---

[14] Although Respondent attempts to form an argument based on Petitioner's alleged "alcoholism," the evidence shows that the instances of Petitioner drinking and driving occurred many years apart from one another. As the evidence shows, in 2008, approximately eight years prior to the February 25, 2016 incident, Petitoner drove with the oldest child after he had been drinking. Respondent did not report this incident to the authorities. On July 2, 2016, Petitoner was charged with his second DUI. This incident occurred after Respondent had taken the children to the United States. In order to deal with his alcohol use, Petitioner has enrolled in the Army Substance Abuse Program, is going to AA meetings, talking to a behavior health specialist, regularly seeing a chaplain, and volunteering with his Church. Respondent's argument therefore fails in this regard.

[15] Under the second paragraph of Article 13 of the Convention, the Court has the discretion to refuse the return of a child where the child objects and is of sufficient age and maturity such that the objection should be taken into account by the Court. Absent such argument from Respondent, subsequently, the Court concludes that the maturity exception defense has not been established by Respondent.

Additionally, Article 12 of the Convention provides for a "settled" defense, in which the Court does not have to order return of a child if the respondent proves that the child is settled in his or her new environment. This defense is only applicable in the event that the proceedings have been commenced more than a year after the date of the wrongful removal or retention. Petitioner filed the Petition within a

## III. CONCLUSION

Based on the foregoing, the Court determines that although Petitioner has established his *prima facie* case under the Hague Convention, Respondent has established by a preponderance of the evidence that Petitioner consented to the children residing in the United States. Thus, the Verified Petition (Docket Entry No. 1) will be denied. Pursuant to 42 U.S.C. § 11603(e)(2), the Court declines to return the children to Germany.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

---

year of Respondent removing the children from Germany and, therefore, the "settled" defense is not available to Respondent.